# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**KATHY PFUND**
   **Plaintiff,**

  **v.**           **Case No. 10-C-1145**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
    **Defendant.**

## DECISION AND ORDER

  Plaintiff Kathy Pfund brings this action seeking judicial review of the denial of her application for social security disability insurance benefits ("DIB"). <u>See</u> 42 U.S.C. § 405(g). Plaintiff alleged disability commencing March 15, 2000, but she did not file her application until October 10, 2007 and in the interim her "insured status" for purposes of DIB expired. Thus, even if her present condition precluded work, in order to receive DIB plaintiff had to prove disability prior to June 30, 2005, her date last insured ("DLI"). <u>See</u> <u>Stevenson v. Chater</u>, 105 F.3d 1151, 1154 (7th Cir. 1997); <u>see also</u> 20 C.F.R. § 404.130.

  The Social Security Administration ("SSA") found the evidence of pre-DLI disability lacking and denied plaintiff's application initially and on her request for reconsideration. An Administrative Law Judge ("ALJ") held a hearing on the claim, but she too found that plaintiff failed to prove disability prior to the DLI. The ALJ specifically noted plaintiff's limited pre-DLI medical treatment, with several of her impairments arising and/or worsening only after her status as an insured expired. The Appeals Council declined review, making the ALJ's decision the SSA's final word on the matter. <u>See</u> <u>Getch v. Astrue</u>, 539 F.3d 473, 480 (7th Cir. 2008).

In this court, plaintiff argues that the ALJ overlooked certain evidence related to her impairments, but most of the evidence she cites was never presented to the ALJ. She also argues that the ALJ erred in evaluating the credibility of her claims, but the ALJ reached a reasonable conclusion based on the evidence before her, one I may not second guess given the limits of judicial review. On consideration of the entire record, I find the ALJ's decision adequately supported and explained, and thus affirm the denial of plaintiff's application.

## I. FACTS AND BACKGROUND

**A.     The Administrative Record Before the ALJ**

**1.     Plaintiff's Application and Supporting Materials**

On October 10, 2007, plaintiff applied for DIB, alleging that she became unable to work on March 15, 2000. (Tr. at 102, 124.) The SSA calculated a DLI of June 30, 2005, based on plaintiff's previous earnings.[1] (Tr. at 110.)

In a disability report, plaintiff listed her impairments as psoriasis, hypothyroidism, a right shoulder injury, bulging discs, depression, and various injuries suffered in falls. She indicated that her psoriasis and hypothyroidism were diagnosed in the late 1980s, that a rotator cuff injury in 1991 started her body's downward spiral, and that her fall in January 2000, which resulted in two bulging discs, destroyed her life as she knew it. As her symptoms worsened, depression set in. She wrote that great muscle and joint pain impaired her ability to walk, resulting in more damage from falls. She indicated that her impairments first interfered with her ability to work in November 1991 and rendered her unable to work as of March 15, 2000. (Tr. at 128.) She reported past work as a CNA for various employers from 1989-2000. (Tr. at

---

[1]Plaintiff does not contest the DLI.

129, 140.)  She described this work as physically demanding, requiring her to lift up to 200 pounds.  (Tr. at 130, 142.)

In a third party report, plaintiff's husband indicated that she was unable to do much, suffered constant pain, and needed to rest and keep off her feet.  (Tr. at 154.)  He indicated that he took care of the family dog and performed most of the housework, cooking, cleaning, and laundry.  Plaintiff needed help dressing, bathing, and caring for herself.  (Tr. at 155.)  On some days, she could not get out of bed, on others she could perform very light duty chores. (Tr. at 156.)  She did little outside the house aside from going to the store once a week, church once per month, and her parents' house once per week.  (Tr. at 158.)

As indicated above, the SSA denied plaintiff's application at both the initial and reconsideration levels.  (Tr. at 52-53.)  Plaintiff requested a hearing before an ALJ (Tr. at 62), and on November 13, 2009, she appeared with counsel before ALJ Margaret O'Grady (Tr. at 26).

## 2.    Hearing Testimony

Plaintiff, born September 10, 1953, testified that she was married, lived with her husband, and had two adult children.  (Tr. at 30-31.)  She had a twelfth grade education with no additional college or vocational training.  She indicated that she last worked in 2000 or 2002 as a nursing assistant.  (Tr. at 31, 40.)  She stopped working due to pain in her joints and difficulty standing, sitting, and pushing.  (Tr. at 31.)  She indicated that she would not trust herself in a position where others could be harmed, such as picking up a baby or driving a vehicle.  (Tr. at 38.)

Plaintiff testified that she took Prevacid for reflux and hiatal hernia; Zoloft for depression; Lorazepam for anxiety; and Synthroid for her under-active thyroid.  (Tr. at 32.)  She also took

3

Enbrel, a weekly injection, for psoriasis and psoriatic arthritis; she was looking into switching to Humira, a stronger type. (Tr. at 40.) She alternated ibuprofen, Tramadol, and sometimes Vicodin for pain. (Tr. at 32.) She reported no medication side effects. (Tr. at 33.)

Plaintiff complained of pain in several parts of her body – her neck, ankles, toes, knees, elbows, hips, shoulders, and head. (Tr. at 33.) She testified that she needed help from her husband to care for her personal needs, including getting in and out of the shower. She tried to perform some housekeeping, but she had to be very careful and move slowly. Her husband did most of the grocery shopping and paid most of the bills. (Tr. at 34.) She engaged in few outside activities, aside from church, which involved attending services about once per month, talking to others on the phone, and praying for them. (Tr. at 35.) She tried to engage in range of motion exercises – moving her arms, stretching her legs, lifting her legs up while laying in bed. She rarely drove because of her limited ability to move her head. Her social activities involved visits from her sisters and parents. She testified that her brother would be hosting the family Christmas gathering, and she indicated that she would go but just sit in a chair, standing a little bit. (Tr. at 36.)

Asked to compare her present condition with the way she was in June 2005, plaintiff indicated that she had deteriorated but that her condition then was much the same as now. (Tr. at 37.) Plaintiff submitted recent photographs documenting her psoriasis and testified that she had similar amounts of psoriasis back in 2005 and earlier. (Tr. at 41.) The ALJ noted plaintiff's limited medical treatment during the pre-DLI period, and plaintiff explained that she experienced frequent turnover of doctors and at the time believed her problems related to menopause. She later switched to a different provider and began to receive proper care. (Tr. at 37-38.)

The ALJ asked about a June 2007 incident in which plaintiff climbed a ladder to retrieve a swimming pool, which did not jibe with her allegations. Plaintiff indicated that she made a mistake on that occasion; her grandchildren were coming over and her husband was gone, so she tried to be independent and reach a small plastic pool for the kids to play in, when her knees gave out. (Tr. at 38.) She testified that she fell frequently because she could not pick her feet up properly and tripped over even tiny objects. (Tr. at 41.)

A vocational expert ("VE"), Robert Neuman, also testified. The VE classified plaintiff's past employment as a nurse's aide as medium to heavy, semi-skilled work. (Tr. at 42-43.) The ALJ then posed a hypothetical question, assuming a person of plaintiff's age (fifty-six), education (twelfth grade), and vocational history, capable of light work; with no climbing, balancing, kneeling, crawling, overhead reaching, or working at heights or hazards; occasional stooping or crouching; able to use the hands on a frequent but not constant basis; with the option to alternate positions from sitting to standing as needed. (Tr. at 43.) The VE testified that such a person could not perform plaintiff's past work but could perform other jobs, such as information clerk, office clerk, and stock clerk. These were all unskilled, light jobs. (Tr. at 43-44.) If the person needed to lie down occasionally throughout the day, these jobs would be precluded. (Tr. at 45.) The same person, limited to sedentary work, could work as a surveillance monitor, production inspector, or information clerk. (Tr. at 46.)

### 3. Medical Evidence

#### a. Pre-DLI Treatment Records

On January 24, 2000, plaintiff slipped and fell, injuring her neck, resulting in two bulging cervical discs. (Tr. at 236.) She sought treatment for her injury at St. Mary's Medical Center

5

on July 24, 2000 (Tr. at 235), and in August 2000 received physical therapy for pain in her neck and other parts of the body (Tr. at 247). On August 7, she reported some improvement in right elbow pain but no improvement with her neck, chest, and back areas. (Tr. at 246.) On August 11, she again reported no improvement, complaining of terrible pain all the time. She was able to do all of her activities of daily living and household activities, but continued to experience pain. She was discontinued from physical therapy in favor of alternative treatment. (Tr. at 245.)

On September 12, 2000, plaintiff again saw a physical therapist. She reported being self-employed babysitting at the time. (Tr. at 236.) She rated her pain currently a 5, 3 at best, 10 at worst, on a 0-10 scale. (Tr. at 236.) She was able to perform home management activities of vacuuming, cleaning, and cooking with "cautious movements." (Tr. at 237.) However, she reported inability to lift a child secondary to pain. She also reported inability to play golf secondary to pain and not swimming in the pool. The therapist noted guarded motions in all directions. (Tr. at 237.) Plaintiff did not complain of upper extremity radicular symptoms. (Tr. at 238.) She underwent therapy for about the next two weeks, noting some improvement, but then failed to return despite the therapist's urging that she increase her activity tolerance.[2] (Tr. at 240-42.)

The medical records then skip ahead two years – to October 24, 2002 – when plaintiff saw Dr. Kirstin Certalic complaining of a headache, which started as a cold about eight days previously. She complained of pain radiating to the right ear. Her past medical history was

---

[2]The note discharging plaintiff from physical therapy is dated February 22, 2001, but it states that she was not seen since September 29, 2000. The note further states that she is currently seeing an M.D. for depression symptoms. (Tr. at 242.)

6

noted to include psoriasis. Dr. Certalic assessed acute sinusitis with headache and prescribed Fiorinal for headache[3] and a ten day course of Amoxicillin.[4] (Tr. at 250.)

The record then skips ahead again, to January 18, 2004, when plaintiff saw Dr. Lester Yan at the urgent care/walk in clinic complaining of a seven to ten day history of coughing, with headache and facial pressure, and some ear pain. She also complained of generalized malaise and fatigue. She was noted to be on Zoloft[5] and Synthroid,[6] with a past medical history significant for hypothyroidism and depression. (Tr. at 252.) On exam, Dr. Yan noted that her skin was without rashes, adenopathy,[7] or jaundice. He assessed acute bronchitis and maxillary sinusitis, to be treated with Tequin,[8] Tylenol, and fluids. (Tr. at 253.)

The record indicates that plaintiff received no further treatment until August 19, 2004, when she visited the emergency room complaining of fever, body aches, and difficulty breathing for several days. She was diagnosed with pneumonia and provided Cefzil, an anti-biotic,[9] and advised to take ibuprofen or Tylenol as needed for fever. (Tr. at 232-34.) An

---

[3]Fiorinal is a combination of drugs used to relieve tension headaches. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000027/.

[4]Amoxicillin is used to treat certain infections caused by bacteria, such as pneumonia; bronchitis; gonorrhea; and infections of the ears, nose, throat, urinary tract, and skin. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000837/.

[5]Zoloft is an anti-depressant. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017/.

[6]Synthroid, a thyroid hormone, is used to treat hypothyroidism, a condition where the thyroid gland does not produce enough thyroid hormone. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000684/.

[7]Adenopathy is swelling of the lymph nodes. Stedman's Medical Dictionary 25 (27th ed. 2000).

[8]Tequin is an anti-biotic. http://en.wikipedia.org/wiki/Gatifloxacin.

[9]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001032/.

August 31 chest x-ray revealed residual interstitial infiltrate in the left lower lobe. (Tr. at 254.)

On September 4, 2004, plaintiff returned to the urgent care/walk in clinic regarding her pneumonia. She reported feeling somewhat better but was still having significant problems with sleeping and coughing. She also reported feeling run down and fatigued. (Tr. at 257.) On exam, Dr. Yan found plaintiff in malaise, but she did not appear cyanotic, diaphoretic, or pale. (Tr. at 257.) Her neck showed full range of motion, and her skin was without rashes. Dr. Yan assessed pneumonia, not fully resolved, and continued her on Levaquin for an additional ten days.[10] (Tr. at 258.)

On October 26, 2004, plaintiff saw Dr. Allison Mailliard as a new patient for a complete physical exam. Plaintiff advised that she was having a lot of issues with her daughter, who was going through a divorce. She also complained of fatigue. She recounted her recent bout with pneumonia, for which she was treated with antibiotics, steroids, and an inhaler. Her past medical history was noted to include hypothyroidism, gastritis, anxiety with depression, gastroesophageal reflux disease ("GERD"), and hiatal hernia. She was at the time taking a variety of medications, including Zoloft, Levoxyl (used to treat hypothyroidism),[11] Lorazepam (used to relieve anxiety),[12] Benadryl, and Prevacid. The note indicates that: "She was a CNA and is now at home currently taking care of her granddaughter and grandson." (Tr. at 227.) On exam, her skin appeared normal, and her extremities were negative for edema or

---

[10]Levaquin is used to treat infections such as pneumonia and chronic bronchitis. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000129/.

[11]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000684/.

[12]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000560/.

cyanosis.[13]  (Tr. at 227.)  Dr. Mailliard assessed hypothyroidism, anxiety with depression, GERD, and hiatal hernia, and provided prescriptions for Prozac, an anti-depressant,[14] and Lorazepam.  Dr. Mailliard spoke to plaintiff about cutting down on Lorazepam in order to help her sleep, stating "we would refer her to a psychiatrist if we needed to."  (Tr. at 228.)  Plaintiff indicated that she would try to cut down on her own.  They also discussed increasing her Zoloft to help her sleep, to which plaintiff agreed.  They also made appointments with ophthalmology and for a colonoscopy.  She was also to undergo various tests and return in four to six weeks, at which time they would discuss the lab work and results of the medication changes.  (Tr. at 228.)  Plaintiff underwent the colonoscopy on December 7, 2004, which revealed minimal internal hemorrhoids.  She was advised to initiate and maintain a high fiber diet.  (Tr. at 229.)

In the last pre-DLI treatment note in the record, plaintiff visited the walk in clinic on March 19, 2005, complaining of a sinus problem, body aches, and ear pressure.  Doctors assessed sinusitis/bronchitis and prescribed Amoxicillin and Allegra.[15]  (Tr. at 259.)

### b.    Post-DLI Treatment Records

Plaintiff saw Dr. Nedal Mejalli on December 5, 2005, complaining of fatigue and wanting her thyroid level checked.   Dr. Mejalli diagnosed perimenopause, depression, and hypothyroidism, ordered lab work, continued Zoloft, and increased Synthroid.   On physical exam, he noted no issues with her skin.  (Tr. at 260.)

---

[13]Cyanosis is a dark bluish or purple discoloration of the skin due to deficient oxygenation of the blood.  Stedman's Medical Dictionary 441 (27th ed. 2000).

[14]http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000885/.

[15]Allegra is used to relieve the allergy symptoms of seasonal allergic rhinitis. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000052/.

On February 10, 2006, plaintiff saw Jennifer Boerger, NP, complaining of coughing, shortness of breath, and chest tightness. Her past medical history was listed as hypothyroidism. On physical exam, Boerger noted no issues with plaintiff's skin, and full range of neck motion without discomfort. (Tr. at 261.) NP Boerger assessed an upper respiratory infection, prescribing Amoxicillin. (Tr. at 262.)

Plaintiff returned to NP Boerger on March 3, 2006, complaining of bilateral ear pain, headache, nasal congestion, and blurred vision. She reported that the antibiotics provided marginal relief, and that over the past seventy-two hours she experienced significant ear pain and pressure. Under past medical history, Boerger wrote: "She is in good general health." (Tr. at 264.) On physical exam, Boerger noted no issues with plaintiff's skin. She assessed prolonged rhinosinusitis, bilateral actute otitis media, and pharyngitis,[16] prescribing Flonase nasal spray, Prednisone, Levaquin, and Zyrtec, and ordering an x-ray of the paranasal sinuses (Tr. at 264-65), which came back normal (Tr. at 263).

On June 20, 2006, plaintiff went to the emergency room complaining of an allergic reaction – bilateral hand swelling – after taking Motrin. She reported a previous reaction to taking ibuprofen, but this was much worse. The ER doctor, E.A. Chen, noted no other musculoskeletal issues and wrote "negative" by skin, but noted a past medical history of low thyroid, psoriasis, GERD, hiatal hernia, and anxiety. Her medications were listed as Benadryl, Synthroid, Zoloft, Lorazepam, and ibuprofen. (Tr. at 222.) On exam, Dr. Chen noted bilateral hand edema extending up to the wrist, as well as multiple areas of scaly, silvery-looking patches across the abdomen consistent with psoriasis. Dr. Chen provided IV medication and

---

[16]In other words, plaintiff had inflammation of the sinuses, middle ear, and pharynx. Stedman's Medical Dictionary 1287, 1362, 1645 (27th ed. 2000).

observed her over the course of two hours, with the swelling decreasing but still present. He provided a five day supply of Prednisone, advised her to take Benadryl, and stop ibuprofen, using Tylenol for pain. She was completely fine on discharge. (Tr. at 223.)

On July 13, 2006, plaintiff presented in the emergency room after a syncopal episode while eating dinner at a restaurant.[17] Plaintiff indicated that for most of the day she did not eat or drink much, except for a lot of diet Pepsi. She complained of feeling weak and washed out lately and indicated being under quite a bit of stress related to the death of a friend and an uncle's illness. She denied chest pain, palpitations, headache, nausea, vomiting, abdominal pain, or back or flank pain. The ER doctor, S.S. Silver, noted that plaintiff normally took Lorazepam prior to bed time, but on this occasion she took two prior to going to dinner and then also had a friend's Propoxyphene.[18] On arrival at the hospital, she just felt tired, not ill or dizzy. Her medical history was listed as hyperthyroidism[19] and psoriasis, and her medications as Zoloft, Lorazepam, Benadryl, Synthroid, and Propoxyophene (a family member's prescription). Plaintiff indicated that she had been feeling somewhat fatigued lately with some mild shortness of breath but denied any dyspnea with exertion,[20] orthopnea,[21] or pedal

---

[17]"Syncope" is loss of consciousness and postural tone caused by diminished cerebral blood flow. Stedman's Medical Dictionary 1745 (27th ed. 2000).

[18]Propoxyphene is used to relieve mild to moderate pain. It should not be taken in combination with other drugs that cause drowsiness, such as anti-depressant drugs. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000649/.

[19]This note lists hyperthyroidism, but plaintiff actually suffered from hypothyroidism.

[20]Dyspnea is shortness of breath occurring during intense physical exertion or at high altitude. Stedman's Medical Dictionary 556 (27th ed. 2000).

[21]Orthopnea is discomfort in breathing. Stedman's Medical Dictionary 1277 (27th ed. 2000).

edema.[22]  She had otherwise been in pretty good health.  (Tr. at 214.)  Dr. Silver noted no skin rashes.  (Tr. at 215.)  Dr. Silver provided normal saline and kept plaintiff on the monitor, with tests coming back negative.  (Tr. at 215, 220.)  Dr. Silver believed plaintiff experienced vasovagal syncope from some mild dehydration and a combination of medications with stress. He recommended that she take only medications prescribed for her and at the times prescribed, follow up with her primary doctor, and drink plenty of non-caffeinated beverages and eat plenty of food.  She was discharged home in the care of her husband.  (Tr. at 215.)

On January 11, 2007, plaintiff returned to Dr. Mejalli, complaining of hot flashes, constipation, hypothyroidism, and sinus pressure with ear pain.  On exam of the back, Dr. Mejalli noted negative CVA tenderness.  He assessed perimenopause, constipation, hypothyroidism, and sinusitis, prescribing Amoxicillin and ordering lab work.  (Tr. at 266.)

On February 8, 2007, plaintiff went to the urgent care/walk in clinic after a slip and fall during which she hit her head and lost consciousness.  A nurse advised her to go to the emergency department for further assessment.  (Tr. at 270.)  X-rays of her left hand and wrist were negative, as was a CT scan of her head.  (Tr. at 210-12.)  Plaintiff followed up with Dr. Mejalli on February 14, with continued left hand pain and headaches.  She had been taking Tylenol and Advil, without much improvement.  On exam, Dr. Mejalli noted no back tenderness. He assessed head contusion, left hand contusion, left shoulder strain, and mid-sacral pain. He obtained an MRI of the head and started her on Tramadol, Fioricet, and Medrol Dosepak.[23]

---

[22]Pedal edema refers to an accumulation of an excessive amount of fluid in the cells of the feet.  Stedman's Medical Dictionary 566-67, 1335 (27th ed. 2000).

[23]Medrol Dosepak is a steroid that prevents the release of substances in the body that cause inflammation.  It is used to treat many different conditions such as allergic disorders, skin conditions, ulcerative colitis, arthritis, lupus, psoriasis, or breathing disorders.

(Tr. at 272.)  The MRI, performed on February 19, was essentially normal.  (Tr. at 274.)

Plaintiff returned to Dr. Mejalli on February 22, complaining of left side body pain, headache, and some dizziness.  She was taking her medications intermittently for pain, but they did not seem to be helping.  Dr. Mejalli prescribed Meclizine[24] and Vicodin with instructions to return in two weeks.  (Tr. at 276-77.)

Plaintiff next saw Dr. Mejalli on March 13, 2007, unable to sleep secondary to pain on the left side of her body.  She continued to experience edema and tenderness of the left hand, as well as recurrent headaches, low back pain, left shoulder pain, and left infrascapular pain.  On exam, her back and neck displayed tenderness.  (Tr. at 278.)  Dr. Mejalli indicated that plaintiff was to continue with physical therapy, and he would reevaluate her in one month.  (Tr. at 279.)

On June 14, 2007, plaintiff was seen in the emergency room complaining of posterior head pain, neck pain, low back pain, and bilateral shoulder pain after losing her balance and falling from a ladder while trying to retrieve a plastic swimming pool from the top of her garage.  She complained of dizziness, but no focal deficit, numbness, or tingling.  She was more concerned at the fact that she had psoriasis and had not shaved her legs in awhile.  ER personnel noted a medical history of psoriasis, psychiatric history, and thyroid disorder.  (Tr. at 201.)  She was noted to be taking Zoloft and Levothyroxine.[25]  Personnel noted tenderness

---

http://www.drugs.com/mtm/medrol-dosepak.html.

[24]Meclizine is used to prevent and treat nausea, vomiting, and dizziness caused by motion sickness.  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000709/.

[25]Levothyroxine, a thyroid hormone, is used to treat hypothyroidism. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000684/.

on palpation of the neck and shoulders, but full range of motion of the extremities and back. Her skin showed no signs of trauma, but she had diffuse signs of psoriasis. (Tr. at 202.) CT scans of the head and cervical spine were negative, as were bilateral shoulder x-rays. (Tr. at 203, 205-08.) Doctors provided Toradol intravenously, which helped with most of her pain. Through time, she was able to ambulate without difficulty and her dizziness improved. She was discharged home with prescriptions for Meclizine for vertigo, Darvocet for pain, and Vicodin for pain. She was to follow up with Dr. Mejalli and return sooner if anything worsened. (Tr. at 203.)

On September 6, 2007, plaintiff went to the walk in clinic complaining of right arm pain secondary to a fall the previous day. X-rays were negative, and Dr. Mark Santa Ines precribed Ultram[26] and cold compresses. (Tr. at 280-82.)

Plaintiff returned to Dr. Mejalli on September 26, 2007, doing well overall but reporting frequent falls, most recently on September 22, 2007. Dr. Mejalli assessed frequent falls with a history of syncope, hypothyroidism, and depression, ordered an MRI of the head, and refilled Vicodin. (Tr. at 284.) X-rays of the knees and left ankle were negative (Tr. at 286), and an echocardiogram was normal (Tr. at 288). A carotid ultrasound revealed no evidence of significant stenosis or plaquing. (Tr. at 290.)

Plaintiff saw Dr. Mejalli next on October 8, 2007, with generalized myalgia.[27] Dr. Mejalli noted that plaintiff had a blood test, which showed possible lupus versus rheumatoid arthritis. She was taking Tramadol and Vicodin for pain. Dr. Mejalli assessed fibromyalgia and referred

---

[26]Ultram, i.e. Tramadol, is used to relieve moderate to moderately severe pain. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960/.

[27]Myalgia is muscular pain. Stedman's Medical Dictionary 1167 (27th ed. 2000).

her to Dr. Lahiri.  (Tr. at 292.)

Plaintiff returned to Dr. Mejalli on October 10, 2007, with continued generalized arthralgia[28] and myalgia and unable to function well.  She also complained of some radiculopathy in the upper and lower extremities.  She was falling secondary to the fact that she was not able to lift her legs up.  Dr. Mejalli assessed back and neck pain with radiculopathy, non-specific polyarthralgia with blood test of possible lupus versus rheumatoid arthritis.  He referred her to Dr. Connor in neurology, and she was to follow up with Dr. Lahiri.  (Tr. at 294.)  Scans of the spine revealed moderate degenerative changes at the C5-C6 level and minimal degenerative change at the L4-L5 and L5-S1 levels.  (Tr. at 296.)

Plaintiff next saw Dr. Mejalli on October 28, 2007, continuing to have generalized weakness, unable to ambulate well, with polyarthralgia and fibromyalgia.  The note indicated that the last time she worked was in 2000; she suffered a fall in 2000, and that is when she quit work.  She "has not been able to work at all since January 2005, and that is the time that she had started being seen in my office."  She also had psoriasis, psoriatic arthritis, and hypothyroidism.  She was not able to do any chores around the house and was very depressed without suicidal ideation.  She was taking her medications faithfully, especially Zoloft and the thyroid medication.  Dr. Mejalli assessed fibromyalgia and advised her to follow up with neurology and rheumatology.  The note concluded: "Definitely at this time and for the past few years, she has been totally disabled."  (Tr. at 298.)  On November 12, 2007, plaintiff underwent x-rays of the hands and feet, which were normal.  (Tr. at 312.)

The record then skips ahead to September 29, 2008, when plaintiff re-established care

---

[28]Arthralgia is joint pain.  Stedman's Medical Dictionary 149 (27th ed. 2000).

15

with Dr. Mejalli, indicating that she recently got back on her husband's insurance. She complained of complications from her psoriasis and psoriatic arthritis. Dr. Mejalli noted severe psoriatic rash over the back and trunk region, but no depression, anxiety, or insomnia. (Tr. at 372.) He assessed psoriatic arthritis and dermatitis, hypothyroidism, chronic back pain, and chronic Meniere disease;[29] refilled her medications; and ordered complete blood work. (Tr. at 373.)

On January 30, 2009, plaintiff went to the urgent care/walk in clinic, complaining of generalized myalgia secondary to psoriasis, and pain in the great toes secondary to gout. She reported inability to do any housework secondary to the severity of the pain. She was almost bedridden. (Tr. at 374.) On exam, Dr. Mejalli found neck, back, and all extremities without tenderness and effusions. She had normal range of motion without subluxation and tenderness. She had severe psoriatic rash over the trunk region and upper and lower extremities and scalp. Dr. Mejalli assessed severe psoriatic arthritis and psoriatic rash with gout. He prescribed Indocin,[30] Percocet, Medrol Dosepak, and a weaning dose of Prednisone, and referred her to Dr. Steven Kenzer, a rheumatologist. (Tr. at 375.)

On March 16, 2009, plaintiff saw Dr. Kenzer, complaining of joint pain, fatigue, and psoriasis. She reported the presence of symptoms for the past twenty years. She complained of constant pain, which improved with rest and taking her medication. She reported difficulty

---

[29]Meniere disease is an affection characterized by vertigo, nausea, vomiting, tinnitus, and progressive hearing loss due to hydrops of the endolymphatic duct. Stedman's Medical Dictionary 518 (27th ed. 2000).

[30]Indocin is used to relieve moderate to severe pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000524/.

sleeping at night secondary to pain, decreased activity capacity, anxiety, headaches, depression, tingling in her hands, dry eyes, ankle swelling, leg pain, and a variety of additional symptoms. (Tr. at 351.) On exam, Dr. Kenzer noted multiple psoriatic plaques over the entire back and on the arms, legs, and chest. Given the severity of her psoriasis, he started her on Enbrel 50 mg sub-cutaneous every week. (Tr. at 352.)

On March 30, 2009, plaintiff returned to Dr. Mejalli, with continued weakness. Dr. Mejalli noted that plaintiff had been seen by Dr. Kenzer, who diagnosed psoriatic arthritis and wanted to start Enbrel. She was unable to do much around the house and complained of fatigue and chronic pain all over the body. (Tr. at 376.) She was to continue with the same management, and start the Enbrel and follow-up with Dr. Kenzer. (Tr. at 377.)

Plaintiff saw Dr. Kenzer on May 20, 2009, tolerating the Enbrel well and describing improvement in her rash and joint pains. She did complain of left knee pain, exacerbated with activity and improved with rest. (Tr. at 380.) Dr. Kenzer continued Enbrel and ordered left knee x-rays (Tr. at 381), which revealed early arthritic change of the patellofemoral compartment (Tr. at 378).

Plaintiff returned to Dr. Kenzer on July 22, 2009, complaining of joint pain in the back and knees. She again reported tolerating the Enbrel well, with her rash and joint pains improved. She did continue to experience chronic low back and knee pain. Dr. Kenzer suspected her back pain was secondary to degenerative joint disease and unrelated to her psoriasis and psoriatic arthritis. (Tr. at 382.) On exam, Dr. Kenzer noted that plaintiff's psoriatic plaques had significantly improved since her last visit. Dr. Kenzer continued her on

Enbrel and also provided prescriptions for Nabumetone[31] and Vicodin.  (Tr. at 383.)

On September 7, 2009, plaintiff visited the ER, reporting that she tripped the previous day while walking up the stairs to her deck, hitting her right shoulder and ear.  She denied dizziness, reporting that she fell due to tightness in her knees.  She indicated that she had been falling a lot because of stiffness from arthritis and fibromyalgia.  (Tr. at 355.)  On exam, Dr. Anthony Deuster noted pain and swelling over the right ear, and right posterior shoulder and arm pain.  (Tr. at 356.)  He assessed a shoulder sprain and laceration.  He cleaned the wound and ordered a shoulder x-ray, which was negative.  (Tr. at 358.)  She was discharged home with instructions to keep the ear clean and dry, and apply ice to the shoulder.  (Tr. at 359-60.)

Plaintiff returned to Dr. Kenzer on October 28, 2009, for follow-up, noting no improvement in her psoriatic lesions with Enbrel.  She also complained of right shoulder pain, which impeded her ability to lift objects; chronic neck and low back pain; and feeling fatigued, weak, and depressed.  (Tr. at 367.)  On exam, Dr. Kenzer noted multiple psoriatic plaques over the back, arms, and legs, worse since her last visit.  Dr. Kenzer switched her to Humira and obtained a right shoulder MRI.  (Tr. at 368.)  Lumbar spine x-rays revealed minimal degenerative changes, cervical spine x-rays showed degenerative changes at C5-6 and C6-7, but her hands and left foot were normal.  (Tr. at 369-70.)

### c.    SSA Consultants

The SSA, through the state agency, arranged for plaintiff's claim to be evaluated by

_____

[31]Nabumetone is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints). http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000907/.

several consultants. On January 8, 2008, Dr. Michael Baumblatt completed a physical capacity report, finding that through the DLI plaintiff could perform light work with limited overhead reaching. (Tr. at 316-23.) On the same date, Keith Bauer, Ph.D., completed a psychiatric review technique form ("PRTF"), finding no severe mental impairment between March 15, 2000 and June 30, 2005. (Tr. at 324.) He considered plaintiff's depression (Tr. at 327), but found that the condition produced no or only mild limitations in functioning (Tr. at 334). On February 15, 2008, Dr. Mina Khorshidi completed a physical assessment report, also finding plaintiff capable of light work but with no additional limitations. (Tr. at 341-48.) On that same date, Dr. Roger Rattan reviewed and affirmed the previous PRTF. (Tr. at 349.)

## B. ALJ's Decision

On January 5, 2010, the ALJ issued an unfavorable decision (Tr. at 10), finding that plaintiff failed to establish disability between March 15, 2000, the alleged onset date, and June 30, 2005, the DLI (Tr. at 13-14). In so ruling, she followed the familiar five-step process for evaluating disability claims. (Tr. at 14-15.)

At step one, the ALJ determined that plaintiff did not work, i.e., engage in "substantial gainful activity ('SGA')," see 20 C.F.R. § 404.1572, between the onset date and the DLI. (Tr. at 15.) At step two, the ALJ determined that, through the DLI, plaintiff had the severe impairments of degenerative disc disease and bulging discs. (Tr. at 15.) The ALJ noted that plaintiff had been diagnosed with additional conditions – sinusitis, pneumonia, hiatal hernia, GERD, and hypothyroidism – but they appeared to have responded well to treatment and/or caused little if any functional limitations prior to the DLI.[32] (Tr. at 15-16.)

---

[32]"An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §

The ALJ further noted that while plaintiff was diagnosed with psoriasis and psoriatic arthritis, this was after the DLI; the record contained no objective evidence of such a diagnosis before the DLI.  Plaintiff reported a "history of psoriasis" during a 2002 examination, but no skin abnormalities were noted during a full physical examination completed in October 2004 and she reported no such history at that time.  Similarly, no mention of the condition was made during a December 5, 2005 visit, close in time to the DLI.  The ALJ noted that the records post-dating the DLI reflected a worsening of this condition, but they provided no information sufficient to relate the condition back to the DLI.  The ALJ accordingly found the condition non-severe during the relevant time.  (Tr. at 16.)

Finally, plaintiff alleged depression and anxiety, and the ALJ noted that she was diagnosed with these conditions during a physical exam on October 26, 2004, with medications prescribed.  (Tr. at 16-17.)  However, the record contained no evidence documenting a longitudinal history of mental problems, and plaintiff saw no mental health professional at any time prior to the DLI.  (Tr. at 17.)  The ALJ further found that, as of the DLI, plaintiff's depression and anxiety caused no restriction of activities of daily living; no difficulty in social functioning; mild difficulties in concentration, persistence, and pace; and no episodes of "decompensation."[33]  (Tr. at 17.)  Therefore, the ALJ found plaintiff's mental impairments non-

_____

404.1521(a).

[33]These four components of functioning constitute the "B criteria" of the mental health Listings.  20 C.F.R. § 404.1520a(c)(3).  The ALJ rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked, and extreme, and the degree of limitation in the fourth (episodes of decompensation) using a four-point scale: none, one or two, three, and four or more.  The last point on each scale represents a degree of limitation that is incompatible with the ability to work.  § 404.1520a(c)(4).  Certain Listings may also be met if the claimant has marked limitations in two of these areas.  E.g., 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  On the other hand, if the ALJ rates the degree of limitation as "none" or "mild,"

severe.

At step three, the ALJ found that, through the DLI, plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the presumptively disabling impairments set forth in the Listings, 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ noted that no treating, examining, or consulting physician found that plaintiff met any Listing. (Tr. at 17.) The ALJ specifically considered the requirements of Listing § 1.04, disorders of the spine. (Tr. at 18.)

At step four, the ALJ found that, through the DLI, plaintiff retained the residual functional capacity ("RFC") to perform light work that involved no overhead reaching. In making this finding, the ALJ considered plaintiff's claimed symptoms and the opinion evidence. (Tr. at 18.) The ALJ noted that in considering the credibility of plaintiff's alleged symptoms, she had to first determine whether plaintiff had some medically determinable impairment that could reasonably be expected to produce the symptoms. If so, she had to determine the extent to which the alleged symptoms limited plaintiff's ability to do basic work activities. For this purpose, if the statements about the symptoms were not substantiated by objective medical evidence, she had to make a credibility finding based on the entire record. (Tr. at 18, citing SSR 96-7p.)[34] The ALJ reviewed some of the medical evidence, then stated:

After careful consideration of the evidence, the undersigned finds that the

_____

she may generally find that the claimant has no severe mental impairment. 20 C.F.R. § 404.1520a(d)(1).

[34]SSR 96-7p directs the ALJ to consider, in addition to the medical evidence, the claimant's daily activities; the frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, for relief of symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment.

(Tr. at 18.)  The ALJ went on to provide more specific reasons for her finding.  First, although plaintiff had been diagnosed with degenerative disc disease prior to the DLI, the medical evidence did not substantiate the alleged severity of her pain and functional limitations.  (Tr. at 18-19.)  Plaintiff's reports of pain appeared to be significantly out of proportion to the medical evidence, and she received little medical care through the DLI.  While she did participate in physical therapy in 2000, she was discharged due to her lack of follow-up despite reported improvement with treatment.  During a complete physical exam on October 26, 2004, she reported no problems with her back or neck, and her musculoskeletal examination was essentially normal.  A CT scan of the cervical spine on June 14, 2007, after the DLI, revealed only moderate degenerative spondylosis localized primarily at the C5-C6 level with no fracture.  Further, the medical evidence showed that she had only been treated conservatively.  Finally, the ALJ found that plaintiff's daily activities prior to the DLI were inconsistent with her alleged inability to work.  For example, it was reported that she was able to perform all activities of daily living and household activities, and she also reported that she took care of her grandchildren.  (Tr. at 19.)  In sum, the ALJ found that while plaintiff's back impairment was severe, the evidence of record did not support her claimed level of limitation, and she remained fairly active when she wanted.  Accordingly, the ALJ found that as of the DLI, plaintiff remained capable of performing light work not involving overhead reaching.  (Tr. at 19.)

Plaintiff reported past relevant employment as a nurse's aide, described by the VE as medium to heavy work and thus precluded by the ALJ's RFC.  However, at step five, the ALJ

found that there were jobs that existed in significant numbers that plaintiff could do.[35] (Tr. at 19-20.)  The ALJ noted that had plaintiff been capable of a full range of light work, Medical-Vocational Rules 202.21 and 202.14 would direct a finding of not disabled.  However, given plaintiff's additional limitations the ALJ relied on the VE, who testified that a person with plaintiff's characteristics could work as an information clerk, office clerk, stock clerk, monitor, or inspector.  The ALJ thus determined that, through the DLI, plaintiff was capable of making the adjustment to other work, and that a finding of not disabled was appropriate.  (Tr. at 20.)

## C.    Request for Appeals Council Review

Plaintiff sought review by the Appeals Council (Tr. at 6, 8), submitting a pro se letter (Tr. at 192-93) and additional records (Tr. at 385-413),[36] which the Council marked as exhibits (Tr. at 4, 5).  However, the Council denied plaintiff's request for review.  (Tr. at 1.)

---

[35]The precise question at step four is whether the claimant can, given her RFC, still do her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If she cannot, the ALJ must at step five determine whether the claimant can, given her RFC, age, education, and work experience, make the adjustment to other work.  20 C.F.R. § 404.1520(a)(4)(v).  The claimant bears the burden of presenting evidence at steps one through four, but if she reaches step five the burden shifts to the agency to show that the claimant can make the adjustment to other work.  See, e.g., Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).  The ALJ may at step five either rely on the Medical-Vocational Guidelines, a chart that classifies a person as disabled or not disabled based on her age, education, work experience and exertional ability, or summon a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite her limitations.  See, e.g., Herron v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994).  However, the Guidelines may be applied only if they fully and accurately describe the claimant's limitations.  If a claimant's non-exertional limitations restrict the full range of employment opportunities at the level of work that she is otherwise capable of performing, use of the Guidelines is precluded, see Lee v. Sullivan, 988 F.2d 789, 793 (7th Cir. 1993), and the ALJ must consult a VE for a more refined assessment, see Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994); Herron, 19 F.3d at 336-37.

[36]A few pages of these materials were duplicates of the evidence before the ALJ (Tr. at 396-98, 412), but most had not previously been submitted (Tr. at 385-95, 399-411).

## II. DISCUSSION

**A. Standard of Review**

Judicial review of an ALJ's ruling is deferential, and the court will affirm so long as the decision is supported by "substantial evidence." Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007). Evidence is substantial if a reasonable person could accept it as adequate to support the decision. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003). While the court must review the entire record, reversing a decision that lacks substantial evidentiary support, it may not re-weigh the evidence, make independent findings of fact, or substitute its judgment for that of the ALJ. See, e.g., Schmidt v. Apfel, 201 F.3d 970, 972 (7th Cir. 2000). If reasonable minds could differ concerning whether the claimant is disabled, the court must affirm the ALJ's decision denying the application so long as the decision is adequately explained. See Elder v. Astrue, 529 F.3d 408, 412 (7th Cir. 2008).

The ALJ must supply an accurate and logical bridge from the evidence to her conclusion, but this articulation requirement is modest. See Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008); Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004). Further, while the ALJ may not ignore entire lines of evidence contrary to her conclusion, she need not provide a written evaluation of every piece of evidence. Jones v. Astrue, 623 F.3d 1155, 1162 (7th Cir. 2010). Finally, because the correctness of an ALJ's decision depends on the evidence that was actually before her, the court may not reverse based on evidence later submitted to the Appeals Council. See Diaz v. Chater, 55 F.3d 300, 305 n.1 (7th Cir. 1995); Eads v. Sec'y of the Dep't of Health & Human Servs., 983 F.2d 815, 817-18 (7th Cir. 1993).

**B.    Analysis**

**1.    Evidence of Other Impairments**

Plaintiff first argues that the ALJ erred in finding only her degenerative disc disease and bulging discs severe prior to the DLI.  She faults the ALJ for overlooking pre-DLI medical evidence of head and neck pain, psoriasis, and mental health treatment.  However, as the Commissioner notes (and as plaintiff concedes in reply), most of the evidence plaintiff cites in her main brief in support of this argument was not before the ALJ; she submitted it later to the Appeals Council.  (Pl.'s Br. [R. 14] at 12-14, citing Tr. at 387, 388, 390, 391, 392, 393, 394, 399, 400.)[37]  Plaintiff does not challenge the Council's refusal to review the ALJ's decision; nor does she ask me to remand the matter for consideration of new and material evidence under § 405(g), sentence six.  See Perkins v. Chater, 107 F.3d 1290, 1296 (7th Cir. 1997).  Rather, she seeks reversal under § 405(g), sentence four, and in considering such a claim the court may not rely on evidence never submitted to the ALJ.  Eads, 983 F.2d at 817.

The ALJ adequately considered the medical evidence that was before her relating to these conditions.  She noted that prior to the DLI plaintiff on occasion sought treatment for headaches associated with sinusitis, with her symptoms responding to medication and treatment.[38]  (Tr. at 16.)   The ALJ further noted while the pre-DI medical records made

---

[37]Plaintiff also heavily relies on this evidence in her statement of the case.  (Pl.'s Br. at 2-4, citing Tr. at 385, 386, 387, 388, 389-90, 391, 392, 393, 394, 399-400, 401, 402, 403.)

[38]Plaintiff notes that headaches alone can be disabling, see, e.g., Tyson v. Astrue, No. 08-cv-383, 2009 WL 772880, at *10 (W.D. Wis. Mar. 20, 2009), and argues that the matter should be remanded so the ALJ can provide a more complete explanation of why her headaches were not severe.  But the ALJ considered plaintiff's headaches, which on each occasion appeared to be related to sinusitis and responsive to conservative treatment.  (Tr. at 16.) Plaintiff cites no evidence suggesting that her headaches constituted a severe impairment or lasted for more than a short time.  The ALJ was not, under the circumstances, required to

reference to a <u>history</u> of psoriasis, plaintiff was never diagnosed with, found to have, or treated for psoriasis prior to the DLI. Post-DLI records suggested that plaintiff's psoriasis worsened, but the ALJ found that those records failed to provide information sufficient to relate the condition back to the relevant time.[39] (Tr. at 16.) Finally, the ALJ noted plaintiff's diagnosis of anxiety with depression and use of anti-depressants prior to the DLI, but found that the absence of a longitudinal history of mental problems or any treatment by a mental health provider prior to the DLI cut against any claim of a severe mental impairment during the relevant time. Consistent with the state agency consultants, the ALJ found no or mild limitation under the B criteria of the mental health Listings prior to the DLI, thus permitting her to find the mental impairment non-severe.[40] (Tr. at 16-17.) Plaintiff makes no argument that the ALJ

_____

say more, and remand on this basis would be pointless.

[39]On October 28, 2007, Dr. Mejalli indicated that plaintiff was currently and for the past few years had been totally disabled. (Tr. at 298.) However, he offered little explanation for this assertion. In any event, plaintiff makes no argument based on this note.

[40]Plaintiff argues in reply that the ALJ mentioned the consultants only with regard to concentration, persistence, and pace, and that the Commissioner's claim that the ALJ's decision was "in line" with the consultants' reports is impermissibly post hoc. (Pl.'s Reply Br. [R. 18] at 1.) Plaintiff is right that the ALJ specifically cited the reports regarding concentration, persistence, and pace (Tr. at 17), but she fails to explain why this requires reversal. The consultants' reports <u>were</u> consistent with the ALJ's opinion, as the Commissioner notes, and no "principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989). Plaintiff further argues that, to the extent the ALJ did rely on these reports, they do not constitute substantial evidence. But the regulations explain that such consultants "are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(f)(2). "It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation." <u>Flener v. Barnhart</u>, 361 F.3d 442, 448 (7th Cir. 2004). Moreover, in the cases plaintiff cites in support of this argument – <u>Whitney v. Schweiker</u>, 695 F.2d 784, 789 (7th Cir. 1982) and <u>Allen v. Weinberger</u>, 552 F.2d 781, 785 (7th Cir. 1977) – the ALJ relied on non-examining consultants to reject treating source opinions. Plaintiff cites no treating source opinion suggesting greater mental

26

ignored important medical evidence that was actually submitted to her, and I may not on judicial review re-weigh the evidence or substitute my evaluation of it for the ALJ's. See, e.g., McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011).

Plaintiff argues that the ALJ erred in requiring contemporaneous treatment by a mental health professional, see Wilder v. Apfel, 153 F.3d 799, 802 (7th Cir. 1998) (stating that what is required is contemporaneous corroboration of the disability, "not necessarily contemporaneous medical corroboration"), but the ALJ imposed no such requirement. In finding no severe mental impairment, the ALJ appropriately considered the entire record, including plaintiff's very limited pre-DLI treatment, the reports of the state agency consultants, and plaintiff's activities. (Tr. at 17.) Plaintiff cites no evidence that was before the ALJ suggesting greater limitations. The mere fact that she was taking anti-depressant medications does not mean the ALJ was required to accept her mental impairment as severe. See Penny v. Astrue, No. 08-2270, 2010 WL 1931312 (C.D. Ill. May 13, 2010) (affirming ALJ's finding that the claimant's depression was non-severe, where a state agency physician opined that the depression was non-severe and the claimant never sought mental health treatment beyond taking medication prescribed by her primary care physician).

Finally, plaintiff notes that the ALJ failed to consider her obesity. As plaintiff indicates, obesity can cause or contribute to immobility, fatigue, or mental impairments such as depression. See SSR 02-1p. However, aside from a single physical therapy record from September 2000, in which the therapist noted plaintiff's "tendency to perseverate on pain

---

limitations in her case. Nor does plaintiff explain how any failure to articulate compliance with the standards of SSR 96-6p constituted more than harmless error.

limiting function/learning, general deconditioned/obese"[41] (Tr. at 239), she cites no evidence of limitations based on her weight. Thus, the ALJ's failure to consider obesity was no more than harmless error. See Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (finding ALJ's failure to consider obesity harmless where the claimant only speculated as to additional limitations).[42]

### 2. Credibility

Plaintiff also argues that the ALJ erred in assessing her credibility. An ALJ's credibility determinations are entitled to special deference because she had the opportunity to observe the claimant testifying. Castile v. Astrue, 617 F.3d 923, 928-29 (7th Cir. 2010). The court must give the ALJ's opinion a commonsensical reading and will reverse only if the credibility determination is "patently wrong." Jones, 623 F.3d at 1160.

As plaintiff notes, the ALJ in the present case started out with this piece of boilerplate:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity

_____

[41]Perseverate means to repeat something insistently or redundantly. http://dictionary.reference.com/browse/perseverate.

[42]Plaintiff argues that her case is distinguishable from Skarbek because she has pointed to a medically documented limitation imposed by her obesity. However, a physical therapist's note that plaintiff seemed fixated on her "deconditioned" state hardly constitutes a documented limitation. The therapist did not appear to endorse plaintiff's feeling but rather sought to push her to "progress activity tolerance." (Tr. at 242.) Where, as here, the claimant alleges step two error in finding certain impairments non-severe, the error may be deemed harmless if the ALJ proceeded with the sequential evaluation process and accounted for all limitations supported by the evidence in setting RFC. See Masch v. Barnhart, 406 F. Supp. 2d 1038, 1054 (E.D. Wis. 2005). Plaintiff fails to establish that the ALJ erred in setting her pre-DLI RFC, with regard to limitations arising from obesity or any other condition. Thus, any error in finding impairments non-severe at step two was harmless.

assessment.

(Tr. at 18.) The Seventh Circuit has rejected this language, which, unfortunately, continues to routinely appear in ALJ decisions in this circuit. See Hoffman v. Astrue, No. 10-C-1152, 2011 WL 3236176, at *9 (E.D. Wis. July 27, 2011) (citing Martinez v. Astrue, 630 F.3d 693, 694 (7th Cir. 2011); Spiva v. Astrue, 628 F.3d 346, 438 (7th Cir. 2010); Parker v. Astrue, 597 F.3d 920, 921-22 (7th Cir. 2010); Crae v. Astrue, No. 1:10-cv-0595, 2011 WL 2728124, at *4-5 (S.D. Ind. July 8, 2011); Heichelbech v. Astrue, No. 3:10-cv-65, 2011 WL 1876181, at *13 (S.D. Ind. May 17, 2011); Sorenson v. Astrue, No. 10-C-0582, 2011 WL 1043362, at *8 (E.D. Wis. Mar. 18, 2011); McGee v. Astrue, 770 F. Supp. 2d 945, 948 (E.D. Wis. 2011); Weber v. Astrue, No. 09-C-0912, 2010 WL 1904971, at *5 (E.D. Wis. May 11, 2010)). However, as plaintiff concedes, the ALJ provided additional reasons for her finding in this case, beyond the above boilerplate; these reasons are sufficiently specific, and I accordingly find the ALJ's preceding boilerplate harmless. See Hadley v. Astrue, No. 10-C-119, 2010 WL 3386587, at *18 n.18 (E.D. Wis. Aug. 26, 2010) (finding use of this boilerplate harmless where the ALJ provided additional reasons).[43]

The ALJ first noted that plaintiff's allegations of severe pain and functional limitations were not substantiated by the medical evidence. Plaintiff claims that the ALJ failed to specify how the evidence conflicted with the testimony, but that is incorrect. The ALJ noted that

_____

[43]Plaintiff notes in reply that an ALJ's credibility determination may not be implied. But the ALJ provided specific reasons for her finding here (Tr. at 18-19); this is not a case where the court would have to cull other portions of the decision for a possible rationale. Cf. Schwabe v. Barnhart, 338 F. Supp. 2d 941, 955-56 (E.D. Wis. 2004) ("In the present case, while the ALJ cited 20 C.F.R. § 404.1529 and SSR 96-7p and discussed some of the relevant factors thereunder in the body of his decision (e.g. daily activities, use of pain medication), he never linked that discussion to his determination that plaintiff's testimony failed to support her claim of disability.") (internal footnote omitted).

plaintiff received little medical care through the DLI; she was discharged from physical therapy due to lack of follow-up, despite improvement; during her complete physical on October 26, 2004, a date close to the DLI, plaintiff reported no problems with her back or neck, and her musculoskeletal examination was essentially normal; and a CT scan of the cervical spine on June 14, 2007, about two years after the DLI, showed little. (Tr. at 18-19.) Plaintiff correctly notes that pain complaints may not be rejected based solely on a lack of objective medical support, but this does not mean that the ALJ is precluded from relying on the medical evidence. See Jones, 623 F.3d at 1161 ("Although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not supported by the medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration."). Plaintiff quotes portions of the medical evidence she finds supportive of her claims, but this is essentially an invitation for the court to re-weigh the evidence and make independent findings, which is improper on judicial review.

The ALJ also noted that plaintiff's daily activities prior to the DLI were inconsistent with her alleged inability to work. For example, the record indicated that during the relevant time she was able to perform all activities of daily living and household activities, in addition to caring her grandchildren. (Tr. at 19.) Plaintiff argues that she did not have to prove that she was incapable of any work to prevail; she only had to prove that she had limitations that would preclude full-time work at the SGA level; and, at her age, a limitation to sedentary work would require a finding of disabled under the Medical-Vocational Guidelines. But the ALJ was in this portion of her decision responding to plaintiff's allegations that she could not work due to pain, fatigue, and other symptoms. Her failure to use proper step five language does not render her credibility finding erroneous. See Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000) ("In

analyzing an ALJ's opinion for such fatal gaps or contradictions, 'we give the opinion a commonsensical reading rather than nitpicking at it.'") (quoting <u>Johnson v. Apfel</u>, 189 F.3d 561, 564 (7th Cir. 1999)).

Plaintiff argues that in discussing daily activities the ALJ omitted certain qualifiers. Plaintiff cites physical therapy notes from August and September 2000, in which she was noted to perform household chores with "cautious movements."  (Tr. at 237.)  She was further noted to be unable to lift or hold her grandchild due to pain, and to have reduced reaching with the upper extremities.  (Tr. at 237.)  She was able to do her activities of daily living and household activities, but she continued to experience pain all the time.  (Tr. at 245.)  These records do not demonstrate error.  First, the records confirm that plaintiff was able to perform all of her daily activities and household chores; this was not a case where the ALJ relied on "rather limited daily activities to discount plaintiff's testimony."  <u>Nash v. Astrue</u>, No. 10-C-353, 2011 WL 197591, at *12 (E.D. Wis. Jan. 20, 2011).  Second, as the ALJ noted, plaintiff's back and neck pain improved with therapy; after several sessions she failed to return, and she received limited pre-DLI medical treatment thereafter.  (Tr. at 18-19, 242.)  Third, the ALJ did not entirely discount plaintiff's claims; she accounted for the qualifiers mentioned in the cited records by limiting plaintiff to light work with no overhead reaching.  Finally, while the ability to care for children inside the home may not automatically be equated with the ability to work full-time outside the home, <u>see</u> <u>Gentle v. Barnhart</u>, 430 F.3d 865, 867 (7th Cir. 2005), the ALJ did not err in considering plaintiff's child care duties as part of her analysis in this case.  In the "work status" section of one of the physical therapy records plaintiff cites, dated September 12, 2000, plaintiff is listed as "self employed" with the occupation of "baby sitting."  (Tr. at 236.)  The progress note from her October 26, 2004, physical indicates: "She was a CNA and now is at

31

home currently taking care of her granddaughter and grandson." (Tr. at 227.)

Plaintiff argues that the ALJ failed to consider other factors under SSR 96-7p, such as changes in her anti-depressant medications, the side effects of her medications, and the consideration of home traction and surgery. However, the records plaintiff cites regarding anti-depressant medications and home traction/surgery were not before the ALJ (Tr. at 387, 388, 392, 393, 394, 400), and plaintiff testified that she experienced no medication side effects (Tr. at 33). An ALJ's failure to discuss all of the SSR 96-7p factors in checklist fashion does not render her credibility finding patently wrong, see, e.g., Smith v. Astrue, No. 07-C-0955, 2008 WL 794518, at *10 (E.D. Wis. Mar. 24, 2008), particularly where, as here, the record contains little or no evidence pertinent to any factors the judge skipped.[44]

## III. CONCLUSION

THEREFORE, IT IS ORDERED that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 26th day of August, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

_____

[44]Plaintiff concludes by arguing that the Commissioner failed to meet his step five burden because the ALJ's hypothetical question to the VE omitted additional limitations. See Young v. Barnhart, 362 F.3d 995, 1005 (7th Cir. 2004) (holding that a step five determination based on a flawed hypothetical question cannot stand). However, because plaintiff fails to show that the ALJ erred in evaluating the evidence and setting RFC, there was no such error. Indeed, the hypothetical question on which the ALJ relied included greater limitations than the ALJ ultimately found supported by the evidence. (Tr. at 43-44.)